CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

MAR 0 8 2017

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## HARRISONBURG DIVISION

| | | |
|---|---|---|
| **JOHN WHITE** | ) | |
| **82 Chew Court** | ) | |
| **Martinsburg, WV 25403** | ) | **Jury Trial Demanded** |
| | ) | |
| **PLAINTIFF,** | ) | |
| | ) | |
| **Vs.** | ) | **Civil Action No.:** 5:17CV21 |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Federal Emergency Mgmt. Agency** | ) | |
| **(FEMA)** | ) | |
| | ) | |
| **DEFENDANT** | ) | |
| **300 D St. SW, 3rd Floor** | ) | |
| **Washington, D.C. 20472-3505** | ) | |

**Serve:**     **Rob Thomas II (Deputy CIO), John Cormack (Branch Chief), Gary Maratta**
**(Special Investigator), Elisa R. Cruz (Division Director), Sailaja Rueff (IT**
**Specialist), Donna Bennett( CISO) Adrian Gardner(CIO) and Robert Partington**
**(Special Investigator) Individually and Officially**

## NOTICE TO DEFENDANT

Failure to appear and defend will result in a default judgment against the defendant for the relief demanded in the complaint. The Defendant has 60 days to respond to the summons.

## COMPLAINT

Comes now the Plaintiff and files this Complaint alleging and representing as follows:

## PRELIMINARY STATEMENT

1.  This is an action under Title VII of the Civil Rights Act of 1964, as amended, to correct unlawful employment practices on the basis of race and retaliation, to vindicate Plaintiff's rights and the rights of other person also denied employment opportunities on the basis of race and retaliation, and to make Plaintiff whole. The Plaintiff is a person protected under the above referenced and ancillary statues. Defendant discriminated against Plaintiff by removal from federal service, isolating defendant from peers, suspension and placing on administrative leave, in retaliation for complaining about and refusing to engage in employment practices unfairly predicated upon religion, whistle blowing, race, sex, harassment, misuse of position and retaliation. Plaintiff's security clearance was allowed to expire and not be renewed based on retaliation and discrimination.

2.  The court has jurisdiction over the subject matter of this complaint pursuant to 28. U.S.C. Sections 1331 and 1343.

3.  The employment practices and civil rights violations complained herein were committed in the Western District of Virginia.

4.  Plaintiff has exhausted his administrative remedies and satisfied all administrative prerequisites by timely filing a Charge of Discrimination with Western District Court, Case No.: 5:11CV00019, and was settled out of court in 2011, with the intention that Defendant would cease with their methods of discrimination. Defendant(s) failed to comply with the agreed upon settlement.

5.  Plaintiff is a citizen of West Virginia and resident of the County of Berkeley.

6. Defendant, Federal Emergency Management Agency, is a federal agency headquartered in Washington, DC. Plaintiff's job location was in Frederick County, Virginia.

7. On 6 March 2017, EEOC Judge Lisa Sirkin, replied back to an e-mail that the Plaintiff had forwarded her regarding FEMA's notification of investigation not being completed in 180 days. Judge Sirkin addressed the e-mail to the Plaintiff, Attorneys Mr. Daniel Piccaluga and Jeff Neurauter of FEMA, and Ms. Kim Good, of Senator Joseph Manchin III's office. Judge Sirkin asked the Plaintiff if he was requesting a hearing regarding his removal. Plaintiff informed Her Honor that he was filing with this court, because this was the 3rd time that FEMA failed to complete a Formal EEO Investigation on his behalf. Her Honor asked if the agency forwarded a Report of Investigation (ROI) with their notification. Plaintiff informed Her Honor that they did not. Plaintiff finds it disturbing that FEMA can conduct internal investigations quickly against individuals for alleged violations, but are slow to bring in external investigators to validate their internal findings via the Formal EEO process. Every complaint that the Plaintiff has filed has yet to have a completed Formal EEO Investigation. Plaintiff informed Her Honor and Senator Manchin prior to getting his 3rd notification, that FEMA deliberately does this when they know that someone is telling the truth.

8. On 3 March 2017, Plaintiff received a certified letter from FEMA EEO, stating that FEMA did not complete his formal EEO investigation within 180 days. Plaintiff was informed that he could request a hearing with an EEOC Administrative Judge or file a civil action. Plaintiff informed the agency of his intentions to file a civil action complaint and he also forwarded the signed document to FEMA EEO and to the EEOC Administrative Judge Lisa Sirkin, of the New York EEOC Office. Judge Sirkin is presiding over another complaint of the Plaintiff, to which FEMA also failed to investigate in over 445+ days.

Plaintiff believes that these missed deadlines were deliberate and intentional; therefore, allowing the Defendant(s) the opportunity to seek employment elsewhere, retire, alter/fabricate testimony (through internal investigations conducted by FEMA Agent Gary Maratta and Robert Partington), or be moved to other elements within Department of Homeland Security.

Plaintiff filed with this court Case No.: 5:11CV00019, because the agency failed to complete an investigation. EEOC No. 570-2015-00196X is before the Administrative Judge because of failure to conduct an investigation , and the same hold true with FEMA Case Number: HS-FEMA-26853-2016. Plaintiff also filed Case No: 5:1cv00100 and Case No. 5:15-CV-00079 and both complaints were dismissed without prejudice from this court. In regards to Case

No. 5:15-CV-0079, Plaintiff was informed that if he had new evidence, he could file at a later date.

9. On 29 July 16, the Plaintiff was removed from federal service for not being able to maintain a Top Secret security clearance. Plaintiff was informed that he worked for Ms. Donna Bennett, the Chief Information Security Officer (CISO). According to Ms. Bennett's testimony, the Plaintiff needed to maintain a Top Secret with Sensitive Compartmented Information (SCI) access to keep employment. Therefore, placing him in the same branch with Sailaja Rueff, who falsely accused him of bring firearms into a federal facility on a daily basis.

The Plaintiff never worked for Ms. Bennett or was assigned to her branch. Evidence showed that once the Plaintiff was removed and given his final SF-50, this documentation showed that the Plaintiff was still assigned to Mr. John Cormack. Instead, the Plaintiff was moved from the Risk Management Section, (that now reported directly to Elisa R. Cruz) and placed in Configuration Management Section which belonged to Mr. Cormack.

Plaintiff forwarded this information to Administrative Judge Lisa Sirkin and a copy of a memorandum from a senior executive of FEMA, stating that everyone's clearances would be down-graded or completely removed. Plaintiff was removed based on retaliation because both parties were ordered to have mediation by Administrative Judge Sirkin. Knowing that the Plaintiff still had a pending EEO complaint, the agency's strategy was to force the Plaintiff to accept a settlement and if not, prolong the process as long as possible. Mr. Ryan Chapline, FEMA Attorney, stated to the Administrative Judge "You know things like this can take years".

Once removed, the agency offered the Plaintiff money to resign. During mediation with the EEOC mediator, the Defendant(s) offered even more money to the Plaintiff if he would resign, and sign a form saying that he would not sue them afterwards. The Mediator agreed that the only way to clear the Plaintiff's name was to go before the judge. The Mediator stated, "Never does the agency offer money" and that the Plaintiff "Must know a lot about how the agency does things". The Defendant(s) stated clearly to the Plaintiff and to the Administrative Judge that the Plaintiff cannot win or be given his security clearance back. Administrative Judge rejected the Defendant's request for Dismissal. Once removed, Mr. Cormack mailed the Plaintiff's personal belongings back to him, after he broke them and then packaged them up.

Plaintiff informed FEMA EEO regarding the matter. Since the Plaintiff refused to accept a settlement, Mr. Cormack has retired as of Dec 16. Ms. Cruz has allegedly been removed as a supervisor and Ms. Donna Bennett has been sent on assignment to another facility. Furthermore, Mr. Rob Thomas II and Craig Fugate have also left the agency. Plaintiff was

placed on paid administrative leave from 8 Aug 13 to 29 Jul 16 and offered money in the fall
of 2016 to resign.

No one pays anyone that allegedly brought firearms into a federal facility, hacked the e-mail
servers to gather evidence against the Defendant(s), played the "race card" by reporting being
discriminated against, created a hostile work environment, and forged signatures to pay for
college tuition. You fire them immediately and you have them arrested. Every time one
allegation came back that the Plaintiff was truthful, out came another one and another one.
Plaintiff was accused of wanting to sue FEMA, just for the sake of suing them.

- o (Plaintiff 's clearance was only valid from 2008-2013; therefore , once placed on
  administrative leave, Plaintiff's clearance could not be renewed after being placed on
  administrative leave, and allegedly revoked in Apr 2014 for pleading his Fifth
  Amendment Rights to Agent Robert Partington's internal investigation. In 2010, Ms.
  Cruz attempted to have the Plaintiff re-submit an SF-86 for a Top Secret Clearance
  investigation, knowing that the Plaintiff's clearance was only 2 years old. This was
  conducted after the Plaintiff filed a formal EEO complaint against her. If Plaintiff
  would have completed the application, it would be highly possible that the Plaintiff's
  clearance would have come back denied from FEMA Security and Ms. Cruz's
  leverage with Mr. Burt Thomas. This was why the Plaintiff asked for a new job
  description during his settlement with the agency in 2011. Lastly, in Apr 2013
  Plaintiff was investigated by Mr. Robert Partington and Agent Gary Maratta for
  another alleged act of misconduct, which proved that the Plaintiff was innocent of all
  allegations; henceforth, through this investigation the Plaintiff mentioned that the
  agency would try to take clearance and have him fired and 4 months later he was
  being investigated again).

10. In Feb 16, the U.S. Government stepped in as Defendant for Ms. Sailaja Rueff, for Case No.
5:15-CV-00079. Given testimony from Mr. Cormack and Sailaja Rueff, stated that the
Plaintiff always carries a gun in the workplace. Through sworn testimony from Mr.
Cormack, the Plaintiff is a very dangerous person capable of causing harm to others; yet, Mr.
Cormack never calls the on-site authorities to report the alleged infractions. Instead, Mr.
Cormack goes across town and reports it the Kristen Gunsolus of Employee Relations. The
Plaintiff was not questioned on the day of the alleged crime or the next day where he had to
pass on-site security, metal detectors and an x-ray baggage scanner.

Mr. Cormack's testimony stated that the Plaintiff was talking negatively against Mr.
Cormack; and therefore, these allegations against the Plaintiff came after the Plaintiff
reported Mr. Cormack to his Chain-of-Command. Mr. Cormack and Ms. Rueff made up the
false allegations out of retaliation. Mr. Cormack surely had motive to ask Ms. Rueff to make

such an allegation, because it benefited him the most. Afterwards, nothing happened to him after he was reported to the Chain-of Command for discrimination.

If Mr. Cormack would have been found guilty of discrimination, then he risked being demoted or removed from federal service. Mr. Cormack had 30+ years federal of service at the time of Ms. Rueff's false allegations and he could not afford to be terminated for discrimination. Moreover, Mr. Cormack took a loss with a failed business attempt; therefore, he could not retire at the time of the allegations. Plaintiff was instructed to provide more evidence to show that the Defendant(s)'allegations were not in the scope of her work.

Shortly after the Plaintiff filed his complaint, two DHS employees were arrested the same day for bringing firearms into a federal facility. (Mr. Jonathan Wienke and Mr. Thomas Pressley). Both violators were arrested and detained the same day and removed from the facility.

(1) http://www.nbcwashington.com/investigations/DHS-Employee-Accused-of-Taking-Weapons-to-Work-Had-19-Guns-10000-50000-Rounds-of-Ammo-at-Home-Affidavit-388994341.html

(2) http://www.nbcwashington.com/investigations/Another-Employee-With-a-Gun-Arrested-at-Homeland-Security-Headquarters-386519051.html

Contrary to Mr. Cormack's actions, the Plaintiff was allowed to finish out the work day, come back to work day-after- day (allegedly with firearms), finish designing a system, and was placed on admin leave after he completed the system. When sitting in Mr. Cormack's office, the day the Plaintiff finished the system, the Plaintiff told Mr. Cormack, Gary Baldanaza, and Thuan Tran that he had finished his Master's Degree and that he had an invite from Harvard Law School. They congratulated him and at no point did Mr. Cormack make any attempt to speak with the Plaintiff about the alleged allegations.

If Mr. Cormack would have contacted the on-site police any day that the Plaintiff was allegedly bringing firearms into the facility, there would have been no need for the Plaintiff being placed on admin leave, because these allegations were completely false. Plaintiff cannot understand why Mr. Cormack would jeopardize his own safety and the safety of his co-workers for several days by not notifying the on-site police; however, the logical thing to do would be to alleviate the immediate threat, by calling local law enforcement and not waiting days after the Plaintiff has taken paid vacation to start an investigation.

DHS seems to agree with the Plaintiff as well, because that is exactly what they did. DHS did not allow these gentlemen to finish the work day, come back the next day, take vacation, and then say, " You know what?, I think we will prosecute them without arresting them or seeing if they had weapons.

Defendant(s) would like this court to believe that an alleged "dangerous" man was allowed to finish out his work day, come back several other days with firearms and no one says, "He has a gun, someone call the police!" Afterwards, they filed these false statements to the Federal Prosecutor, to have the Plaintiff sent to prison, knowing that these allegations were false. Plaintiff was not arrested the day in question or any day thereafter. Again, the Plaintiff has to pass armed police, baggage scanner and metal detector before entering the facility, just as the two gentlemen that were arrested did. These allegations have changed the Plaintiff's life drastically, because it was so farfetched that other allegations had to be told once it was proven that the Plaintiff did not commit this crime. Unfortunately, whether true or false, these allegations have cost the Plaintiff a GS-15 jobs with other federal agencies and federal contractors, because the Plaintiff would not give a false answer when interviewed. Plaintiff has suffered lost wages and will likely have to foreclose on his home because of failure to obtain employment due to false allegations and no security clearance.

11. 13 Jun 15, Plaintiff e-mailed Mr. John Cormack requesting to speak with his new first and second line supervisors that were addressed in Mr. Cormack's memorandum. Allegedly, Mr. Cormack did not know who the Plaintiff's new supervisors were as he stated in his memorandum, and the Plaintiff had not been assigned new supervisors at the time the memorandum was drafted. Plaintiff was informed that the agency can reassign him to another position requiring him to have a security clearance and then terminate him for not having a security clearance. Since various positions at FEMA do not require security clearances, the Plaintiff was not assigned to one of those positions or allowed to transfer to another DHS entity, when requested by the Plaintiff's attorney.

12. 6 Apr 15, Mr. John Cormack forwarded a memorandum to Plaintiffs's attorney Mr. Michael Riselli, stating "On April 30, 2014, I issued your client, John White, a Notice of Proposed Removal based upon the revocation of his security clearance. Since then, Robert Thomas, II, *i.e.*, the Deciding Official, separated from the Agency and, therefore, is no longer an appropriate deciding official. Additionally, the Office of the Chief Information Officer (OCIO) has recently undergone a re-organization, which resulted in Mr. White's first and second-line supervisors changing. As a result, I am rescinding the Notice of Proposed Removal and will forward all of the information related to the proposal to Mr. White's new first-line supervisor. In light of this decision, Mr. White will remain on administrative leave status and his new first-line supervisor will determine how to proceed with this issue." Based

upon this re-organization, the Plaintiff was not allowed a chance to compete for any positions based on the Plaintiff's experience or level of education while being placed on Admin Leave.

13. 25 Feb 15, Rob Thomas II announced that he is leaving FEMA after he learned that Mr. Riselli and filed a complaint with the Washington, DC EEOC Office. Allegedly, Mr. Thomas II was hired by the Dept. of Veterans Affairs.

14. In Feb 15, FEMA EEO hired EEO Investigators to conduct Plaintiff's EEO investigation. The Contracting EEO Investigator stated that he was given 30 days to conduct the EEO investigation and that none of the Plaintiff's witnesses were contacted. Since the matter was in the hands of the Washington, DC EEOC, FEMA was conducting an "after the fact" investigation. Ms. Sailaja Rueff was not interviewed; yet, she was the person that stated the Plaintiff brought firearms into the facility to Mr. Cormack. According to the testimony from the Report of Investigation, Mr. Cormack and Kirsten Gunsolus stated that Sailaja Rueff was the person that filed the complaint and mentioned that the Plaintiff owned guns. Agent Gary Maratta stated that he did not know that the Plaintiff was Black until the day of the interview; however, Agent Maratta has interviewed the Plaintiff on three different occasions. Therefore, providing false testimony to be submitted before the Administrative Judge. Agent Maratta gathered information from the Plaintiff and relayed this information back to the Chain-of-Command and the alleged 9 people that he said told him that the Plaintiff had firearms in the facility. Agent Maratta asked the Plaintiff in Dec 13, if the Plaintiff had any witnesses? The Plaintiff gave him the names of several individuals and absolutely none of them were interviewed.

15. Nov 14, Attorney Michael Riselli filed a formal complaint with the Washington, DC EEOC to place sanctions on FEMA for not completing the investigation.

16. 30 April 14, Plaintiff was forwarded a memorandum by Mr. John Cormack, requesting that the Plaintiff be terminated for security clearance being revoked. Plaintiff stated that under his previous settlement with the agency, that he was required to have a new job description. Unfortunately, FEMA did not comply with the settlement agreement that they agreed upon with Civil Action No. : 5:11CV00019, which is a violation to the agreement. Plaintiff's clearance was not revoked until after the Plaintiff applied for a GS-2210 -15 position within the agency. Plaintiff was informed that his clearance was revoked because he refused to participate in an investigation on 8 Aug 13 after invoking is Miranda Rights. Mr. John Cormack made the proposal and Mr. Rob Thomas II was the deciding official.

17. Jan 14, Plaintiff filed a formal complaint with FEMA EEO. FEMA failed to conduct a formal investigation within the required 180 days allowed. Plaintiff then contacted the EEO Office in Oct 14 and requested the status of his complaint. Ms. Pauline Campbell replied to

the Plaintiff the same day and stated that it was still going. Plaintiff was not forwarded a request for extension.

18. 12 Dec 13, Plaintiff was instructed to meet Agent Gary Maratta at the Winchester VDOC facility for an investigation. Agent Maratta informed the Plaintiff that he had been accused of bringing firearms into his place of work, created a hostile work environment by encouraging other employees to file EEO complaints, and that the Plaintiff was "playing the race card" by filing EEO complaints to exhort money from the agency. Plaintiff vehemently denied all allegations. Agent Maratta showed Plaintiff an e-mail where the FEMA investigators tried to have the Plaintiff prosecuted for bring firearms into the facility. The prosecutor declined to press charges, because he/she stated in the e-mail that the Plaintiff did not have a criminal record. Agent Maratta asked the Plaintiff to name witnesses who could validate his testimony. Plaintiff did so and no witnesses were ever contacted.

19. Oct 13, Plaintiff filed a lawsuit with Western District Court, Harrisonburg, VA, Civil Action No.:5:13C00100. Afterwards, the Plaintiff asked that the case be dismissed without prejudice and allow FEMA an opportunity to allow FEMA EEO to complete a thorough and impartial investigation. The court granted that motion.

20. 5 Sept 13, Mr. Cormack e-mails the Plaintiff, Mr. Riselli, and Loretta Vardy of FEMA, stating "Yes, I am certainly open to assistance. As for me, I don't believe there are any issues under my control that cannot be resolved with a facilitated conversation". This matter was regarding (ADR). If this was true, then that means that those allegations against the Plaintiff were not as severe as the Defendant(s) first said or they were fabricated after the Plaintiff filed his lawsuit in Oct 13 with this court. Defendant(s) did not know what evidence that the Plaintiff had against them and the only way to have the Plaintiff interviewed was by filing with the Federal Prosecutor. Mr. Cormack had absolutely no authority to dismiss a crime that violated 18 U.S. Code § 930.

21. On 8 August 2013, the Plaintiff met with Mr. Robert Partington, Mr. Paul Rudolph and Mr. John Cormack. Once the Plaintiff met with Mr. Partington, Partington informed the Plaintiff that he needed sign a form waiving his Miranda rights or he would be terminated that day. Plaintiff placed in writing, "that he did not have anything to say regarding past, present, or future events regarding FEMA, which he filed formally or anyone the Plaintiff was unaware of". Plaintiff then presented his badge and Blackberry to the investigator. Mr. Cormack handed Plaintiff a document saying that Plaintiff was placed on Administrative Leave for no reason other than that the agency is conducting an investigation with no date of when Plaintiff is to return to duty. Yet, on 7 Aug 13, Mr. Partington stated that he would explain the applicability of the Miranda Rights, by stating that the Plaintiff had to waive them or be terminated that day.

22. On 7 August 2013, Plaintiff was e-mailed by Investigator Robert Partington stating that he needed the Plaintiff to come in on 8 August 2013 to conduct an interview.  He did not state why Plaintiff was being investigated and Plaintiff did not want to proceed with another FEMA investigation.  Plaintiff e-mailed Mr. Partington and asked him if FEMA policy superseded his Miranda Rights?  Mr. Partington stated in his e-mail, "Mr. White, I appreciate you getting back to me.  Thank you for your agreement to meet tomorrow.  When we meet I can explain the applicability of Miranda and your right to remain silent.  It's easier explained in person".

23. In Jun 2013, Plaintiff asked Mr. Cormack for a laptop for a new hire that is in Plaintiff section.  Mr. Cormack looked the Plaintiff in his eyes and told him that he did not have any and that Plaintiff's new hire should just take her laptop back and forth with her if she wants to telework.  Plaintiff got a desktop computer for Plaintiff's new hire.  Ernesto Matos informed the Plaintiff that Mr. Cormack did have laptops and that he just did not want to give one to the Plaintiff.  Plaintiff was given a copy of property items that belonged to the branch and it also reflected that Mr. Cormack had unassigned laptops at the time requested.

24. On 10 July 2013, while in our section chief's meeting with John Cormack, Mr. Ernesto Matos Jr. asked John Cormack for a laptop.  John instructed Ernesto to get one out of his cabinet.  Plaintiff then said to Mr. Cormack," You lied; I thought that you did not have any laptops?"  Mr. Cormack replied, "I beg your pardon", Plaintiff then replied, "You lied and told me that you did not have any laptops and I had to go and get a desktop from Sean Cross ".  Mr. Cormack then replied, "You are full of shit".  That evening, Mr. Cormack e-mailed down town to see if Sailaja Rueff had a laptop.  Plaintiff notified Mr. Cormack's supervisor Landon Cochran and he e-mailed Plaintiff and stated that he will talk with Mr. Cormack.

25. Plaintiff was refused support from Mr. Rob Thomas when the Plaintiff asked to speak with him regarding the matter pertaining to Mr. Cormack that transpired on 10 July 2013.  Plaintiff also e-mailed Mr. W. Craig Fugate asking to speak with him as well regarding the matter.  Mr. Thomas instructed the Plaintiff to take it up with Plaintiff's supervisor and Mr. Fugate simply did not respond back.  Mr. Landon Cochran contacted the Plaintiff and informed him that he would speak with Mr. Cormack.  Mr. Cormack later apologized to all of the section chiefs for his outburst and afterwards he retaliated against the Plaintiff by placing him on Admin leave.

26. In March 2013, Plaintiff was contacted by investigators Robert Partington and Gary Maratta, stating that they wanted to conduct an interview with the Plaintiff, regarding a claim that Plaintiff used government equipment to locate his son who was placed on a Child Abduction

List for the past 10 years. Plaintiff explained how he located Plaintiff's son and then asked the investigators do they always investigate an employee because someone sends in a letter stating so, without vetting that person? Moreover, Plaintiff asked what would happen to this individual for filing a false statement and wasting government resources. Plaintiff was told that they would not do anything. Plaintiff was informed by Investigator Gary Maratta and Robert Partington that DHS Headquarters wanted the investigation to happen.

27. Plaintiff has been singled out because Plaintiff had prepared to blow the whistle on FEMA and their hiring practices, abuse of power, time card fraud, nepotism regarding the great number of family members working at the agency, how previous retired employees come back as CORE employees and then as contractors working on the same projects without a one year absence, child pornography being accessed at a federal facility, people being paid "hush money" for withholding evidence or giving false testimony. Moreover, Mr. Rob Thomas provided contracts to former business associates which creates a conflict of interest; moving personnel into positions without allowing others to compete for those positions.

28. In July 2013, FEMA was hacked by Anonymous and Plaintiff put in writing his concerns to management about other systems that are at risk, and yet the Plaintiff was ordered to implement a system that was not complete and with known vulnerabilities. When Plaintiff made suggestions, they began to go through Sailaja Rueff and had her move forward with the process. Plaintiff was not placed on Administrative Leave until after this system was completed and implemented. Plaintiff was moved out so that Ms. Rueff could oversee Plaintiff project after it had been implemented, because she would not point out weaknesses with the process of how FEMA operates.

29. As the Risk Management Section Chief, Plaintiff was assigned to work on a project that belonged to another branch. The other branch sat on the project for 8 months that a white co-worker did not implement; therefore, Mr. Cormack volunteered Plaintiff to take on the project because Plaintiff did not have work in his section; moreover, provide an opportunity for Mr. Cormack to leverage with his supervisor. Plaintiff was held at a higher level of expectation to get the task accomplished than his white counterpart. Moreover, Mr. Cormack who does not have a degree has no problem with asking Plaintiff to keep him informed about the project, but then goes right behind the Plaintiff's back to ask a white colleague if what the Plaintiff is saying and doing is correct; even though they have nothing to do with Plaintiff's project.

30. Over the past year, the Plaintiff filed with Human Resources on several occasions about Plaintiff Disabled Veterans' Preference and no one had fixed the problems. Plaintiff's Master's Degree from Johns Hopkins and Plaintiff's Veteran's Preference help with possible

future promotions; however, Plaintiff feels this was done deliberately to prevent him from advancement within the organization or outside the organization.

31. In the summer of 2012, Teresa Lipscomb was assigned to Plaintiff's section after she was asked to interview with Risk Management Section, Performance Section, and Requirements Section. She did not interview with Configuration Management or Testing Sections. Ms. Lipscomb had filed an EEO complaint before and asked to be transferred to another branch. She was represented by Plaintiff's attorney, Mr. Michael Riselli. Ms. Lipscomb was on Medical Telework since December 2012 and had been allowed to do so even when there was no sufficient work for her to perform. Plaintiff mentioned this to Mr. Cormack that we need to have work for her to complete so that she cannot be accused of time card fraud. When Plaintiff mentioned this to Mr. Cormack, he moved her into the Mr. Gary Baldanza's section and had work assigned to her, that was new to her and hoping that she could not accomplish this task in the requested times so that he could let her go as a CORE as he did with Ms. Brandi Bunner.

Firing Ms. Lipscomb for failure to perform an assignment would clear him from any backlash for knowingly validating her timecard when he knew that she had not been working. Moreover, Plaintiff even stressed this point to him when her laptop was inoperable and that Ms. Lipscomb could not telework from her blackberry. He did not care, because this was a way to set her up for timecard fraud. Plaintiff then asked that she be moved to someone else's section because Plaintiff refused to be part of that underhandedness. Plaintiff also wrote a memo to Mr. Cormack and the section chiefs about people targeting Ms. Lipscomb. Plaintiff had noticed that Michele Fletcher and Ernesto Matos were allowed to adjust their telework days in conjunction with their leave days. Moreover, Mr. Cormack was requiring personnel to e-mail him when they started telework and when they finished once Ms. Lipscomb was on board.

Plaintiff explained to them that telework is a privilege and if the supervisor had already approved someone to telework, then they are saying those individuals are responsible. Furthermore, Mr. Cormack and Mr. Matos were requesting that everyone keep the days that they were teleworking into the Branch Calendar. Plaintiff created a memo expressing Plaintiff's concerns; Mr. Matos removed his days out of the calendar completely because he was one of the violators. Mr. Cormack never corrected the situation and continued to allow it to happen.

32. Since being placed into the IV&V Branch, Mr. Cormack did not treat the Plaintiff the same as he did white counterparts or those that he has had past working relationships with. Even Plaintiff's white co-worker that was considered a problem child was never placed on administrative leave.

33. The Plaintiff was also the last person to have personnel assigned to his staff and when Plaintiff did, it was someone that Mr. Cormack considered to be a problem child. Mr. Cormack ensured that other sections not only had better accommodations, but they also had first choice of establishing their teams with personnel; therefore, qualifying them as supervisors. Plaintiff was told that Michele Fletcher and Ernesto Matos were the only section chiefs that could be in charge when Mr. Cormack was absent, because they were supervisors. However, that was not accurate. While Mr. Cormack was serving as the Deputy CIO, Plaintiff found out that only Michele Fletcher was listed as a supervisor and not Mr. Matos. Plaintiff was informed by Mr. Thuan Tran, "That people, who know how to do the job, have no people and those with no experience get contractors and government workers to perform their tasks; and that you should just drink the Kool-Aid".

34. In 2012, Mr. Cormack was assigned to review a strategic plan that was sent from our former CIO, Ms. Jeanne Etzel. Mr. Cormack sent a copy to all of the section chiefs and asked us to review the document. Several section chiefs stated that the document looked good. Plaintiff replied back and stated that it was "Fluff" and Plaintiff made suggestions. Mr. Cormack then took Plaintiff suggestions and passed them on as his own to upper management. Plaintiff asked Mr. Cormack; why he took his work and passed it off as his own? Mr. Cormack stated that "He used to work for a SES that did the same thing to him, and that his supervisor received a cash award for it." Mr. Cormack reminded Plaintiff, that he only has a high school diploma and that he has people with degrees working for him. Mr. Cormack stated that "I want you to teach all of the other section chiefs what you are learning at Johns Hopkins". Nevertheless, he put another colleague on a project that was Plaintiff idea and when Plaintiff asked him how she got on the project, he stated that "I do not know". When Plaintiff asked the guy they call Stu, who was in charge of the project, why aren't any Blacks, Hispanics or Asians on the project, he stated, "Rob Thomas wanted him to pick people that did not have an axe to grind with anyone in the agency". Plaintiff stated that some of those people on the team are not qualified.

Plaintiff asked him how did Michele Fletcher get on the team and he told him in front of witnesses that John Cormack put her on the team. Plaintiff found out that Thuan Tran, and Michele Fletcher use to work for John Cormack previously and that John Cormack also lied to him so that he could hire Michele Fletcher for the testing position that Elisa Cruz was referring months before. After Plaintiff mentioned that there was no diversity on this team, a token Black was assigned to say that there is a Black on the team a month later.

35. In May 2011, Plaintiff applied for training funds for tuition assistance because Plaintiff was attending graduate school. Plaintiff submitted paperwork on several occasions and nothing happened until mentioning EEO and talking with Mr. Cormack's supervisor. Plaintiff was

informed that other employees are having their graduate degrees funded by the agency. Nevertheless, Plaintiff kept a low profile as Plaintiff's attorney instructed him to do so. Plaintiff paid for the first semester out of pocket which totaled over $8000 dollars. When Plaintiff's supervisor realized that Plaintiff was accepted and had registered for school, Mr. John Cormack wanted to send the Plaintiff off on a disaster mission. Plaintiff said that he would deploy if he would be reimbursed for the tuition that Plaintiff had paid for school. Mr. Cormack did not offer to reimburse the Plaintiff; therefore, Plaintiff was never sent out for support.

36. From Apr 2011 until Oct 2011, Plaintiff sat in his office given two assignments to complete a Risk Management document and a budget. Plaintiff noticed that even though he had come to the branch prior to Plaintiff's co-worker, Mr. Thuan Tran, Mr. Tran was given better equipment and a larger office than himself. Plaintiff was given the worst furniture of all the section chiefs and the computer that he had, only had 500 MB of memory; therefore, the system crashed quite often. Meanwhile, other sections had faster desktops, laptops and some even had I-Pads. A newer member to our branch was given better office furniture as well. For over a year, Plaintiff asked Mr. John Cormack for better office furniture and a better chair because Plaintiff has a disability and nothing was resolved to date. Nevertheless, they have new furniture brought over to the new section chief months before Plaintiff had a new desk.

37. In Apr-May 2011 time frame, the Plaintiff was called into Mr. Cormack's office and verbally reprimanded about speaking with Ms. Brandi Bunner, regarding an EEO complaint that she had filed against management. Days before, Brandi Bunner had approached the Plaintiff and asked who was his attorney and if he could provide her his number. Ms. Bunner stated that she filed an EEO complaint and that management asked her to drop the case. Once she dropped the complaint, management released her from employment. "By dropping the case, Ms. Bunner could not file retaliation against the agency" Mr. Cormack stated in our meeting.

38. Upon reporting to IV&V branch, the Plaintiff's attorney Mr. Michael Riselli had informed the Plaintiff to keep a low profile. The Plaintiff also informed his attorney that the IV&V branch was considered to be the branch of misfits. He also spoke with the Western District U.S. Attorney regarding the matter. Allegedly, the Plaintiff was reclassified into another position that Plaintiff did not have any expertise in and the agency had no plans of using either. Under this new transformation/re-organization, Plaintiff section is no longer under Mr. Cormack's branch. The Plaintiff was only moved to this branch in hopes of preventing a lawsuit. Mr. Riselli informed the attorney representing the government that this position was

in the "bone pile" branch and they ensured that it was not. However, that is exactly what was happening.

39. After being on Admin Leave for almost 6 months, on 24 March 2011, a memo was drafted by Mr. Carlos Davila, instructing Plaintiff to return to duty on 28 March 2011. In the memo, Plaintiff was instructed to report to Mr. Ernesto Matos Jr., who was the Acting Branch Chief for Mr. John Cormack. Mr. John Cormack is Plaintiff's current supervisor. Plaintiff was placed into the Independent Verification and Validation Branch (IV&V), as a Risk Management Section Chief. The Risk Management Section was created and the Plaintiff was assigned there, with the intentions of the Plaintiff dropping lawsuit Civil Action No.: 5:11CV00019. Paragraphs 7-29 were complaints that were file previously and settled out of court with conditions that the defendant had to adhere to.

40. In February 2011, the Plaintiff was interviewed by Special Agents Gary Maratta and Danny Raines of Department of Homeland Security (DHS), FEMA Office of Security, Fraud and Internal Investigation division, Law Enforcement Coordination and Investigation Branch, 1201 Maryland Avenue, SW, Room 205, Washington, DC, 20024. The investigators stated that they were told by Mr. Steven McDevitt and Elisa Cruz that he was dangerous and that he owns a lot of guns. Agents Maratta and Raines stated that they were the ones who had the police come out to the Plaintiff's home and that they had "dropped the ball on this one." The Plaintiff asked them if he was so dangerous, why allow him to come to work on 12 Oct 2010; and call a fire drill to have everyone evacuate the building if he was so dangerous? Why did FEMA not inform the Plaintiff that he was on Admin Leave until the Plaintiff was back at home at 1145, 12 Oct 2010? The Plaintiff believes that his supervisors and security investigators were trying to set the Plaintiff up so that they can have a reason to terminate him with a building full of witnesses outside to verify what happened. Unfortunately, for the agency, the Plaintiff complied with all commands given by security forces. Special Agent Maratta and Raines also informed the Plaintiff about their supervisor Mr. Burt Thomas and that he happen to be very good friends. Therefore, the Plaintiff did feel that what the investigators reported back the Mr. Thomas would be communicated back to Ms. Cruz. Therefore, causing a conflict of interest and providing counter-measures for the Defendant.

41. On October 12, 2010, the Plaintiff was placed on Administrative Leave (with pay) until further notice. The document did not state why the Plaintiff was on admin leave other than that that agency was conducting an investigation and that he will be informed at a later date. The Plaintiff's supervisor was not placed on admin leave, and therefore possibly allowing the Defendant to make the necessary corrections or cover up her wrong doings without the Plaintiff's knowing.

42. On October 1, 2010, two police officers came to the Plaintiff's house and stated that someone
from FEMA HQ called them and wanted them to give the Plaintiff a hotline to call if he
needed to talk because they were worried about the Plaintiff hurting himself and his family.
The Plaintiff considered this as just another form of harassment, because this was the one
year anniversary of him filing his EEO complaint and nothing had been resolved. The
Plaintiff also felt that was a ply to create the event that took place on 12 Oct 10 prior to
placing him on administrative leave.

43. The Plaintiff was suspended from Oct 1-4, 2010, for failure to follow instructions after he
sent an e-mail to inform Mr. Fugate about his suspension. During the first day of suspension,
the Plaintiff learned that his FEMA e-mail account was locked and deleted along with all of
the documents that the Plaintiff had to prove his allegations against his supervisor and upper
management.

44. On or about August 20, 2010, the Plaintiff was notified that he was denied access to Mount
Weather worksite. The Plaintiff was told that his access was revoked by Elisa Cruz, his
supervisor, because the Plaintiff was no longer located on Mount Weather; however, all of
the employees from his branch that worked in Washington, DC, continued to have access to
Mount Weather.

45. On or about June 11, 2010, the Plaintiff was issued and official reprimand for alleged failure
to follow instructions and making inappropriate statements, because the Plaintiff's supervisor
had the Plaintiff work outside the scope of his job. Therefore, giving them reason to
orchestrate grounds of termination if necessary. When the Plaintiff asked for documentation
to help with the project, the Plaintiff's supervisor refused to produce it for his project. The
Plaintiff did submit his findings and yet he was still reprimanded. The Plaintiff also
informed the top official for FEMA, Administrator Craig T. Fugate of the situation. Mr.
Fugate has an open door policy and was informed of the event via e-mail. Mr. Fugate did not
respond back to the Plaintiff regarding the matter. Mr. Fugate is also located in the same
building on the same floor as EEO as well. Afterwards, the Plaintiff was instructed by Mr.
Steven McDevitt not to contact executive management.

46. In March 2010, the Plaintiff was retaliated against because he filed an EEO complaint when
he was moved from Mount Weather to Brooke Road Facility and away from the rest of his
teammates; furthermore, he was forced to perform duties that he was not hired to complete.

47. March 2010, Ms. Cruz tried to detail Plaintiff to another department and requested that the Plaintiff submit his resume for a position in another department, if the Plaintiff would drop the EEO complaint against her. Ms. Cruz informed the Plaintiff that she would see that he gets an engineering job in that branch. However, after speaking with John Cormack, the manager of that department, Mr. Cormack stated that he did not have any engineering positions and that he was unaware of what the Plaintiff's supervisor was talking about.

48. In March 2010, the Plaintiff was required to report to the second-line supervisor rather than the first-line supervisor. The Plaintiff was moved out of the Engineering Section, although he was hired as the Security Engineer.

49. On or around January/February 2010, upon information and belief the Plaintiff was not selected for the position of Information Technology Specialist (Team Lead/InfoSec), GS-2210-14, Job Announcement Number CB-09001Q, nor was he notified as to when the position was filled or by whom. This was a position that the Plaintiff had applied for within the branch.

50. In February 2010, during the snow storm that hit the east coast, the Plaintiff was told that everyone in his branch could work from home except him. He was told to come in to work even during severe weather conditions.

51. In January 2010, the Plaintiff was unfairly rated "Less Than Satisfactory" in two of his job elements without just cause. Mainly, because one of the complaints filed to EEO about never having a quarterly or annual job performance review.

52. In December 2009, the Plaintiff was denied Telework after surgery; however, other similarly situated employees were allowed to Medical Telework.

53. In November 2009, Eddie Stallworth came to the Plaintiff's office and made a false statement against the Plaintiff, stating that he felt threatened. A witness wrote a sworn statement validating that the Plaintiff was innocent and that Ms. Cruz did not want to address the situation. The Plaintiff believes that the supervisor sent the employee to his location to create a hostile work environment, so that the Plaintiff would revoke his EEO complaint filed against her. Mr. Stallworth had also worked with Ms. Cruz at another job location, prior to being hired by Ms. Cruz at FEMA. Mr. Stallworth was quoted as saying, "I'll do anything for boss lady" referring to Ms. Cruz.

Sometime after returning from admin leave in Mar 2011, Mr. Stallworth came out to the Plaintiff's office and apologized to the Plaintiff for everything that transpired previously. (Being Masonic Brothers, Mr. Stallworth and the Plaintiff shook hands and all was forgotten). Unfortunately, Mr. Stallworth filed an EEO complaint against Ms. Cruz, because she called him stupid on a conference call. Ms. Cruz was sent to work at DHS Headquarters for several months and then returned back to duty at FEMA. Ms. Cruz was later removed from being the CISO and placed into another area of responsibility as a supervisor.

54. 1 Oct 2009, the Plaintiff filed a complaint with EEO; however, the Plaintiff was unaware that the EEO office and Ms. Cruz's office at that time were located in the same building. The Plaintiff found out that EEO had been speaking with Ms. Cruz about everything that the Plaintiff had filed against her prior to them accepting his formal complaint. The Plaintiff was told that the average government worker retires as a GS-7 step 7 and that not too many Blacks make it to the Plaintiff's grade of GS-14; therefore, he should just suck it up.

55. In Oct 2009, the Plaintiff was unfairly counseled for questioning whether a change request should have been approved by executive management. He was later falsely accused of bullying. The statement that was written accusing all of these allegations had no names of individuals that were bullied or times when all of this was to have taken place; nevertheless, the Plaintiff was given a $3000 cash award in the same year for outstanding job performance.

56. In August 2009, the Plaintiff asked to be moved out of his supervisor's branch. The Plaintiff addressed this with Mr. Steven McDevitt, who was the Deputy Chief Information Officer at that time. Ms. Cruz told the Plaintiff, that she could not allow him to leave because she did not want to lose her slot; however, new hires have been moved completely out of the Plaintiff's section with no problems.

57. On a continuous basis from May to October 2009, Ms. Cruz accused the Plaintiff of insubordination for failing to meet with her daily before the Plaintiff's scheduled start time and the Plaintiff was not compensated for those meetings. The supervisor later sent OPM documents to justify working the Plaintiff without compensation.

58. In April 2009, the Plaintiff was asked by Ms. Cruz to write a false statement against a Caucasian colleague. The Plaintiff refused to do so and Ms. Cruz began to mistreat the Plaintiff thereafter. The Plaintiff was told that he did not have a pair of balls because he did not write a false statement. However, the same female co-worker that yelled at the Plaintiff was not treated poorly for not writing a false statement against the same co-worker, but was given a promotion and a completely different job classification that she has no degree or

certification to qualify for that grade or series.  She was given this promotion for not
providing evidence to the Office of Special Counsel against Ms. Cruz.

59. October 2008, Ms. Cruz counseled Plaintiff after falsely accusing Plaintiff of disclosing the
amount of his cash award with a co-worker.

60. In June 2008, Ms. Cruz required the Plaintiff to apologize to female co-worker that yelled at
the Plaintiff, because the Plaintiff questioned the need for anyone to know about his security
clearance.  The Plaintiff asked the co-worker to leave his office if she was going to continue
to yell at him.

61. In May 2008, Ms. Cruz requested that the Plaintiff write, "What Would Jesus Do (WWJD)"
on all e-mails that required immediate attention.

62. In March 2008, Elisa Cruz stated that she changed Plaintiff's resume and then offered
another candidates resume for the Plaintiff to add to his resume if he needed to fluff his
resume.  The Plaintiff declined to do so.  The Plaintiff was assured that Ms. Cruz can hire
anyone she wants, because she has direct hiring authority.  After becoming a government
employee, the defendant found out that his supervisor cannot change his resume, nor can she
send out other candidates resumes.

63. Plaintiff is entitled to a declaration that defendants acted in violation of Title
VII of the Civil Rights Act of 1964, as amended, and the Civil Rights Act of
1991.

64. As a result of Defendant(s) violation of the law as alleged herein, Plaintiff suffered the loss
of wages and the indignity, humiliation and embarrassment of being removed, suspended and
placed on admin leave in retaliation for whistle-blowing and filing complaints about unfair
employment practices.  Plaintiff has been refused employment because FEMA placed in the
Plaintiff's SF-50 for potential new employers to contact them addressing the Plaintiff's
removal; therefore, spreading untruths about the Plaintiff.  The Plaintiff could not receive
unemployment compensation, because the Defendant(s) listed the Plaintiff's removal as
misconduct related.

65. As a result of Defendant(s) conduct as described herein, Plaintiff suffered emotional distress
and anxiety for which he should recover such sums as a jury may award.

66. Plaintiff is entitled to an order compelling his re-instatement with Defendant, FEMA, or in the alternative an order of judgment for future lost earnings in an amount to be proved at trial.

67. Defendant(s) acts were done intentionally and with malice; to cover up the injustices that are allowed to happen within FEMA; moreover, with an improper discriminatory motive and with a reckless indifference to Plaintiff's state and federally protected rights.

68. Such conduct should not be tolerated and punitive damages in the amount of 4 Million Dollars ($4,000,000) or as otherwise fixed by a jury and available under applicable law should be awarded to punish Defendant(s) and deter such conduct in the future.

69. Plaintiff requests a written formal apology and that his picture be displayed in all common areas showing that the Plaintiff was discriminated against because of race. Cancellation of the proposed removal action and expungement of all documentation relating to the proposed action, as well as any prior disciplinary actions and/or any negative performance-related, paperwork from the employee's Official Personnel Folder.

Since Plaintiff has been removed while he still has a pending EEO complaint, he would ask to be restored back to full service status, Employee will be issued "Fully Successful" annual performance ratings for 2013, 2014, 2015, 2016 and 2017, to effective date of reassignment, Rescission of the proposed security clearance revocation action and immediate restoration of the employee's security clearance, Reassignment of employee to GS-14 IT Specialist position for which he is qualified or to similar position. Agency will pay all moving and relocation expenses for any reassignment, and Reimbursement of attorney fees within 30 days of effective date of final settlement agreement.

70. The court should enter a permanent injunction prohibiting Defendant(s) from engaging in future discrimination in employment and make such order under such terms as the court deems appropriate.

71. The Plaintiff is entitled to an award of attorney's fees, expert witness fees and The Plaintiff is entitled to an award of attorney's fees, expert witness fees and costs incurred herein, pursuant to 42 U.S.C. Section 2000e (5) (k).

## PRAYER FOR RELIEF

1. Assume jurisdiction over the case set forth herein.

2. Declare Defendant(s) in violation of the Civil Rights Acts and ancillary statutes cited herein.

3. Grant a permanent injunction enjoining Defendant(s), its owners, officers, management personnel, employees, agents, successors and assigns, and all persons in active concert or participation with defendant, from engaging in employment practices which discriminate on the basis of race on such terms as the court may direct.

4. Order defendant to carry out and institute policies, practices and programs providing for equal employment opportunities to all individuals.

5. Order Defendant(s), to employ Plaintiff, or in the alternative, to award Plaintiff compensation for lost earning capacity and future earnings and benefits of employment in such amounts as are determined at trial.

6. Order defendant to make Plaintiff whole by compensating him for past and future pecuniary losses, including emotional pain and suffering, mental anguish, humiliation, embarrassment, and loss of enjoyment to life, all in such amounts as are to be proven at trial.

7. Order Defendant(s) to pay punitive damages to Plaintiff in the amount to be determined at trial for Defendant(s) deliberate and malicious deprivation of Plaintiffs civil rights as cited herein.

8. Award Plaintiff his costs of suit and his reasonable attorney's fees, cost and expert witness fees pursuant to 42 U.S. C. Section (5) (k).

9. Order Defendant(s) to pay pre-judgment and post-judgment interest on all amounts due to Plaintiff as a result of this action.

10. Order such further or alternative relief in favor of Plaintiff as the court deems appropriate.

## JURY TRIAL DEMANDED

Plaintiff is requesting a jury trial on all questions of fact or combined questions of law in fact raised by this complaint.

Respectfully Submitted

John White

John White
82 Chew Court
Martinsburg, WV 25403
202-230-0794